I represent the appellants, and I would like to reserve five minutes of my time for rebuttal. So for finding summary judgment on the statute of limitations on inquiry notice, as the panel knows, that is an inherently factual determination. And there are three stages of those factual judgment on inquiry notice prior to February of 2009. Are you arguing that Talley wasn't on notice? I think that you can make an argument that Talley had suspicions or had concerns, I mean, when she wrote the letter. So I think that certainly there was evidence presented that she had an obligation at that point to make a reasonable inquiry. So let's go back. I want to understand, in this case, you allege that the defendant, the remaining defendant, made misrepresentations, correct? Yes, and material omissions. And omissions. And the misrepresentations and omissions were about basically how long the insureds would live. Not entirely. Well, but isn't that, at the end of the day, I mean, what you're saying, I think, in the complaint, is that we were told we wouldn't have to put money in and we were told money would come out more quickly. And you're only talking about two contracts here, right? Right. Because the third one paid off. And when should your clients have been on inquiry notice that things weren't going as promised? Well, I think there's two aspects of the promise. One is they were told the policies would pay off on a certain date. Right. But the other thing is they were told that eventually the policies would pay off. And one of the critical aspects of our claim was it wasn't until February of 2011 that they received facts that would indicate that their eventual payment was at risk, not just that they wouldn't get paid out on time, but that they would most likely or there was a risk they would never receive the money when the insureds died. So there's two components there. Okay. As to the first component. Okay. Surely they were on inquiry notice when people started outliving the estimates. Well, they were – I don't think they were on inquiry notice of fraud, though. I mean, just because something – you know, that's a prediction. You're never on inquiry notice of fraud. What they were on notice of is that the statements made to them appeared not to be accurate. Well, they were on notice that the predictions had turned out to be wrong. That would be accurate. So shouldn't – shouldn't a reasonable person at that point have begun an inquiry into the – into the truth or false – truth or falsity of the statements? Right. And they did that. That's what they retained Mr. James to do. But – and as to Mr. James, here's the problem that I have. He's not a fiduciary for the defendant in this case. So I'm not sure why his – I'm not sure why there should be any tolling of the statute of limitations while they're checking with their lawyer. They're engaged – they've begun the reasonable inquiry, so the statute of limitations begins to run, doesn't it? Well, actually, I don't think that's the case, because the thing is when you – your obligation is to make a reasonable inquiry. If the reasonable inquiry comes out empty, that doesn't mean the statute of limitations starts to run. It's just like if you go and you engage a professional, and in this case he wasn't engaged because he was their estate planning attorney. He was engaged because he was wearing a dual hat as an insurance agent. I understand that. But so your position is that if you – if you're put on inquiry notice and engage in a reasonable inquiry and get – and it comes up empty, that the statute is tolled until you're put on notice again? Is that how you read the California cases? That's how I read the California cases, and it's also how I read the Ninth Circuit's case in Seaboard, because that's actually what happened in Seaboard, was that the person was indisputably on inquiry notice of a fraudulent statement. They went to the company. They consulted with the underwriter. The underwriter told them. That's not California law. So California law says if there's a brief suspicion, and this is in the medical malpractice context, so there's a brief suspicion and the doctor quells that suspicion and it goes away, then the statute of limitation doesn't – the cause of action doesn't accrue and the statute of limitations doesn't start running. But here Talley didn't have a brief suspicion. She had a sustained suspicion for, like, several years. And so once you have, I guess, suspicion, actual suspicion, then you're on inquiry notice, and I think the question then shifts to what would a reasonable person have found out? Now, the other side puts into evidence or cites to this 1998 book that says before 2002 it was well understood that there were risks with the viatical insurance investment program. So why isn't that to say there's no genuine issue of material fact when the other side didn't put in any evidence that that was not knowable, at least as to Talley? Well, actually, the thing is what happened was it was the opposite. On the moving papers, the defendants didn't present any evidence that an investigation would have revealed the true fact. We presented the book as evidence to show that a false statement had been made in our opposition – in our opposition. And the thing is, is that this book – this was a book that came out in 1998. It was out of print. But it cited other articles and other sources of information that were available at that time saying that the viatical investments might not be risk-free, as they had been told. Well, the book cited articles that had been published contemporaneously at the same time as the book in the late 1990s. I think the question is, would a reasonable person – would a jury necessarily conclude that if Talley had investigated herself instead of relying on Mr. James to investigate, that she would have found this book or thought to go back, you know, all this time to these articles, that the information is so voluminous and so overwhelming that it would not only put her on notice, that people – patients were living the normal life expectancy. But for summary judgment, what evidence did your client put in the record that that was not the case? Excuse me? So we're on summary judgment, and there's evidence in the record that that information about the viatical industry was available. And so what evidence was there in the record put on by your client that that was not the case, that a reasonable person could not have found this or found out? Well, I think the burden of proof was the other way, that the defendants had to present evidence that showed that there was irrefutable evidence that – an overwhelming amount of evidence that they would have found out, and the book was not. Is that right? If your client – let's assume for a moment, I know you don't concede this, that when your clients learned that the people they bet on hadn't died, and when your clients learned that they weren't put on some sort of inquiry notice to look more deeply, if that's the case, if your clients were on inquiry notice, isn't it your burden to show that a reasonable investigation wouldn't have, you know, come up with the true facts? We're leaving aside the question about whether a policy would pay at all. I'm just focusing now on the fact that the insureds didn't die as quickly as your clients hoped. Well, I think we did, because the reasonable investigation was that they retained Mr. James. So that's my question. Is that a – is the reasonable investigation to go to the very person who sold you the policies and ask whether or not these policies are good? Well, the thing is, they didn't see him as, at that point, he was still their trusted fiduciary and attorney, and they thought he was on their side. They didn't see him as the opposing side. They didn't see him as the opposing side. This is abject. I'm sorry. Go ahead. Judge Hurwitz asked you a question earlier, which had a premise I wanted to see if you agree with. James is their estate attorney, right? Yes. Do you agree that he had no fiduciary relationship? Oh, he absolutely had a fiduciary relationship with the Traybirds. Absolutely. Did he have one with the defendant, with Page? The plaintiffs did not have a fiduciary relationship with Page. Okay. So, plaintiffs, your argument is, well, here's where I see this. I don't see a big difference between Talia and her siblings, given the fact that the correspondents went, they were told about her suspicion. Now, they may not have believed it, but they were told about it, so it seems to me that puts them on inquiry notice. To me, the question really comes down to, in this case, is, assuming that James is a defendant attorney, and also given the fact that he's the one who recommended these investments, is that enough investigation to go to your fiduciary and say, look into this and tell us if there's something rotten here? I think it is, because there's a number of California cases that we cited where people did engage professionals, whether it was an attorney, whether it was a professional engineer, whether it's going to a doctor for a second opinion, somebody they trust, somebody they consider to be knowledgeable. And in this case, Mr. James had represented that he had a personal, he was a personal friend of Mr. Page's, that he knew this company, that he knew these policies intimately, so they reasonably believed. He knows a lot more than we do. He has access to information that we don't have. He's going to be able to go to the company and figure out what's going on. He's going to know more than we do. You're talking from their perspective, but this is an objective inquiry, correct? We have to determine that a reasonable person in that situation would not have discovered the facts showing the injury and the tortious cause. So I think the argument would have to be, what's reasonable for a person in that situation where, you know, your attorney is getting a commission from the investment and whether that's a reasonable inquiry? Well, I think that that's the same as, like, a stockbroker where, you know, the stockbroker is getting a commission from the investment. It's still reasonable to go back to your stockbroker and say what's going on here and to rely upon that. What does the attorney tell them? All I can find in the record is that the attorney tells them, well, I've checked. They still have a website and they're still in business. Well, there was actually more than that that we cited in our opening brief because that was just the one. Well, tell me where in the record the attorney, is there a declaration from somebody that the attorney told them more than simply they're still in business? There's Talley's deposition testimony where she testified to that. And there's also Mr. James' testimony where he testified to the same thing. And he said what? Let me find it. Because I'm – and this is a premise, I think, to a second question, which can you tell me when Talley's handwritten letter at the beginning of 2008, is it? 2009. 2009. Is that done before February 2nd? We don't know. The judge says on or about January 29th. Right. But there's no evidence of that. Well, you mean he made the date up? Yeah. I mean, that's what I'm saying is that the letter is undated. I know, but did the judge make the finding up? Well, I don't know where the judge got the finding because the letter is undated, but it encloses a check that's dated February 1st. So I don't know why you would conclude that the letter was written before the check that was enclosed with the letter. There's no evidence as to the exact date that the letter was written. Well, did Judge Ikuda ask you about the fact that James was getting a commission? Did they know he was getting a commission? They testified that they did not know that. I thought they knew – they testified that they knew he was getting a commission, but they didn't know the amount. That's what I have in my head. That's what I – that's what the record says, I believe. I don't – I mean, I would have to go back and look at that specific issue. My recollection was that they – that at least Bertita and Vernon did not know he was getting a commission. I'm not sure about Talley. I think there was a letter that referenced it in passing. So my notes say that's at ER 228 to 29, 410, 417, and 425. I'm looking at the same thing. We can go back and look at that. It says, okay, this is from the depo of James. Did you disclose to the Traberts that you were going to receive a commission of 7 percent of the investment amount? Answer. I did not disclose to the Traberts that I was going to receive a commission of 7 percent. I did discuss the fact, and they knew that I was going to be paid by commission on this, not how much. And I don't think they'll find any contradiction of that in your client's declarations. Well, I'm not sure it would have been in the declarations. Or in their deposition. But put that aside for a moment, because you mentioned a second argument, and we've never let you develop it. And that's that you think that there was a misrepresentation made that when these people died, the money would be paid. That's right. Tell me what that was. Well, basically that the representation all along, especially when they investigated Mr. James, was, you know, look, these people live longer than expected due to these advances in AIDS, but eventually they're going to die and you're going to get your  And as we pointed out in our briefing, one of the key things is that this Aetna policy has an anti-assignment provision. Was that raised to the district court? It was. And that because of that, you know, when he dies, and there's a couple of several other things, other issues with the Aetna policy, is that when this individual dies, there's a serious risk they're not going to, in fact, a high likelihood they're not going to see the money. When did your clients, now let's go back to the statute of limitations issue, when were your clients aware or should they have been aware of the anti-assignment provision in the policy? Well, they couldn't have found that out before they received the policy, which they didn't have access to because they're only beneficiaries. So when did they get the policy? But when they were on inquiry notice, I would submit, is when they learned that Page and Associates was going to be taking over the servicing of the policy. When did they get the policy? They got the policy in discovery in this case. Okay. But when they became concerned about the risk of their eventual repayment was when they learned that Page and Associates was going to be taking over the servicing because at that point, there's no independent oversight and there's nothing to stop Page and Associates from saying that these people are still alive when they're not or from Page and — As a factual question, is the Aetna policy relates to one of the two remaining people but not both of them? Exactly. But there are issues with the union banker's one as well. Your time has expired, but we'll give you a minute for rebuttal. Okay. I'm sorry. I apologize. May it please the Court. My name is Tom Fitzgibbon and I represent the appellees William Scott Page and Page and Associates doing business as a lifeline. I think the Court has identified the key issue. Can I ask just a quick procedural question? Is there still a judgment against James or is that vacated? They dismissed. What happened was Judge Alsop set a hearing and the plaintiffs elected to dismiss James, so he's out of the case. Well, I guess it doesn't make any difference why, but that seems a lot. There was financial issues for him.  The plaintiffs and the appellants have suggested that the burden of proof was on us, citing to Nevada Power and the irrefutable evidence standard. They've really conflated the way that this works. And I think the Court's identified the right framework is, first, is whether the plaintiffs have knowledge of facts that show that they have a claim. Are they on inquiry? That's the first situation. Let's assume that they are on inquiry notice way back when. But as to the assignability of the policy, which is the last, that's why I was interested in the last issue that your opponent raised, when should they have been on inquiry notice that there might be a problem with paying at all? I certainly think they got some notice early on that these investments were not going to pay off as expected because the life expectancy of the insurers was increasing. But when did they get a note? When did they first put on inquiry notice that this might be an investment that paid no money at all? The question, I think that goes to the issue of whether that aspect creates a separate claim or cause of action. Well, sure. Sure. And I think the answer is there are remedies. What they sought in this case was rescission, and they sought rescission because they claimed that they didn't get the truth about the policies. The question is, for example, if they gave, they have alleged that there were multiple false statements. Now we have a focus on this one. They say. Yeah. Let's just say they dismissed everything and brought one claim. Yeah. We want this, we want the Aetna policy rescinded because it's not an assignability and we were misrepresented. The, as to the issues, that really goes to the fraud, right? Well, no. No, it doesn't. Under California law, okay, if there's two different claims, I think it's Fox v. Ethicon, there's two different claims, then you're on, you have to be on separate notice for each of them. If the elements are, if they accrue at different times, the example was from the medical malpractice case where the doctor conducts the surgery on day one, commits malpractice, then later the implanted medical device fails at a different time. But in this case, the statements that, the issue here is that they claim there were omissions, a large number of omissions plus affirmative misrepresentation. Sure. But they say, and this is the part of the case that helps you. They say, look, the money didn't come in when it was supposed to and the people didn't die when they were supposed to. So I was worried that the representations about the profitability of this enterprise were improper. And maybe there are inquiry notices at that point. But why are they inquiry notice that the whole thing may be a scam because the money will never come to you in any event? Why are they? That's a separate misrepresentation. Is that a separate fraud or is that just part of the scope of the fraud? No, it's not. No, it's part of the whole aspect because they're claiming that they didn't get enough information, right? They say that Page and Lifeline knew information and didn't give it to them. One piece of that information. This is an evidentiary fact as opposed to an ultimate fact, because that's when the word fact is used, that's what needs to be distinguished. And I think the court in Jolly, the California Supreme Court, made that distinction. It's the ultimate facts, enough to bring a claim, not every evidentiary fact or that would support an additional basis. Could they have brought a claim in 2008 or 2009 that you failed to tell me that the Aetna policy was not assignable? How could they have brought that claim at that time? They could have brought it. They didn't even have access to the policy, did they? They could have brought a claim that said that they were not given enough information. And then in discovery sought to develop more reasons? Don't we always tell people not to bring claims until they have them? I understand the distinction here. But what the California Supreme Court in setting out the standard has set forth is that are there enough facts known to bring the action and those ultimate facts. And when we look at what the plaintiffs actually did here, the real trigger was that they hired counsel to bring this claim. The only thing that they identified that occurred that was the, quote, trigger was this claim that they had to the servicer had changed. That doesn't relate to the allegations of the complaint. They alleged in the complaint that the Florida Department of Insurance had done an investigation, and they allege that. They don't allege when they discovered it. It was a public record. The counsel found that. Counsel had identified these issues. That was the only distinguishing factor. The cases have said that's not enough. And so in that setting, the – because the only thing they pointed to was this letter where they said it's not going to be Kaufman-Rossen collecting premiums and paying out, it's going to be Page. And they said, oh, that gave us the trigger. I respectfully submit that that was a pretextual argument, that they had suspicion. So there was suspicion by Talley's letter that the Court has identified. And at that point, right then and there, the Court says you have to go find the facts. The facts do not – you do not have to wait for the facts to come to you. They had – at that point, they had to find facts, and if they existed, to bring the claim. Roberts. How would they have determined – how would a reasonable inquiry in 2008 have let them know that the Aetna policy might not be assignable? Who had possession of the policy? Page – Lifeline had possession of the policy. And could – and did these folks have the right to access to the policy? The – I believe that they did. And so here's what they didn't do. They did not ask Lifeline for this. They didn't write a letter. They didn't do anything other than inquire of Mr. James, and you saw the e-mail that was pointed out. It was an e-mail where he said they have a website. And his investigation into this did not appear to be significant. But they themselves – Well, it was more than that, as I understand it. He sent the e-mail, but then he had actually had a meeting with all three, and went out of his way to reassure them, told them suing is not a good idea, this is – I know Page, he's just, you know, he's a stand-up guy. I mean, am I wrong about that? Well, the – he had a – there was a dinner meeting in October in Chicago with them. He didn't – there's a dispute over whether he said he knew Mr. Page. That's not an issue here. But if there's a dispute, he said it for purposes of summary judgment. But the – so he gave them information about it. But as the Court has identified, whatever he said does not toll the statute of limitations against Page or Lifeline, that he was not acting on their behalf at that time. And the information available to them, with this suspicion, they needed to go forward and figure things out. There were letters that were sent by the company identifying them. But isn't that for the jury to decide? I mean, as I understand what the law in California is, once there's a – once, you know, it's the same case. We have – there's the cases on where they went and got a second medical opinion. So isn't it really what's a reasonable inquiry that has to be undertaken once you're put on notice? And is – No. I'm sorry. I didn't mean to. Well, okay. Point to me why that's not the law. Well, there's a – there's two analyses. Part one is do they have inquiry notice? And in this case, they did, because they knew of all the elements, right? In the other cases – Well, they didn't – well, that's two different things. Reasonable inquiry and knowing all the elements are two separate things. But go ahead. That you know enough of everything that exists. You know you have damage. And California law presumes that there's a wrongful cause. The Supreme Court has said in the – Okay. So let's – but answer Judge Moore's question. Let's assume that they were on inquiry notice at point A. Tell me why – he was asking why going to your lawyer and asking questions isn't a reasonable inquiry. Because that – the inquiry notice starts the clock. The other part is if you don't have notice, there's two prongs. The prong to the right. The second prong says if you don't have any reason to suspect, if you have no suspicion. The Klefeld case talked about this, where it said you have no duty of inquiry. If you have a suspicion, if you have an affirmative suspicion and are there – We're on the same – we're on the same page. They have suspicion. They've got inquiry notice. They do – they say how should we inquire?  I'll go to my – I'll go to my lawyer. So they're on – That doesn't toll. That part. That only happens. The tolling – I'm sorry. This is a distinction between accrual and tolling. And this is all about accrual today. We're not about tolling. Let's talk about accrual for a moment. So they have the – either actual suspicion or constructive suspicion. And the next question is they're put on – so they're put on notice of all facts that a reasonable inquiry would disclose. It's the two prongs for constructive discovery. The first prong is you have to have notice or constructive notice. And the second prong is the cause of action would be shown by all facts that a reasonable inquiry would disclose. So the question is would the cause of action here been shown by all facts that a reasonable inquiry would disclose? The answer is yes, because – And why is that? What they would have done is they would have asked for information from the company about the status and how these – about the policies and about what was going to – So you're saying as a matter of law, a reasonable inquiry would require questions to the company or some other types of actions? Is that what you're saying? Well, I'm not sure that I agree with the framework where you've said that they were – the way that you've suggested that the inquiry is required when you have the suspicion. That is – that is a constructive aspect of it. If you have subjective suspicion, if you suspect fraud, you have a duty to go find things. Well, that's – I see that with – And then the second part, the constructive piece, is when you do not actually have the questions you said, I did not suspect. I didn't suspect at all subjectively, and here's why. And then you say that I didn't invest – I have two – I have two obligations at that point why I never had the suspicion. One is I have to tell you what I eventually learned and when I learned it. And two, the second – this is the second prong, is what we've been discussing, is that a reasonable investigation would not have located – Right. And you're asking us to say as a matter of law that going to your lawyer and asking him to do further investigation, which did not turn up all the things that they now allege, was not a reasonable inquiry. In this case, there was – there was enough evidence that it was not a reasonable investigation. Now, I don't think that that matters. We don't – So you're saying they should have ignored their lawyer and gone directly to the company and asked for information. They could have done a number of things. Well, I mean, they could have, but I'm saying should have. You're saying as a matter of law, going to your lawyer and asking him to check up on this and then learning from him that he had – he says he's checked up and everything looks fine, that a reasonable inquiry would have turned up more because they shouldn't have done it that way. In this setting, the reasonable inquiry, they didn't explain what he did relative to the concerns that they had. So in our view, what they did, the evidence they put out, they had the burden under California law to put on the evidence of the reasonable inquiry. We don't believe that the evidence they put on was sufficient. But the key issue was that whole argument about whether the inquiry was necessary doesn't come into play because they had the subjective suspicion. You only get to that is when you're telling the court, here's why I didn't have any suspicion, here's why I didn't know, and sometimes you say, because I didn't know I was injured at all or because I didn't know of a certain set of facts. In this case, they knew of the defendants, they had written to their lawyer about them, and they identified all the concerns. Roberts. Go back to Judge Acuda's question, because I still don't think you've answered it. Judge Acuda says, and I think she's right, California law says that once you're on inquiry notice, you are put – you are held to notice of everything that a reasonable inquiry would have disclosed. Do you agree with that? I think the way it's framed is there's two parts to this. I know, but just do you – is that an accurate statement of California law? Once you're on inquiry notice, we treat you as having notice of everything that a reasonable inquiry would have disclosed. Yes, exactly. Okay. Now, my next question, I know you want to say something different, but I get to ask, is why isn't going to your – they went to their lawyer. Why isn't that per se a reasonable inquiry, and that reasonable inquiry did not disclose the information they wanted? Because the – in that setting, if it was the case, the lawyer did not have an expertise into the strike debt. The – in this case, they allege that the lawyer had a relationship, and that he was the one that was involved in this. And so in terms of that, that really isn't why the summary judgment was proper in this case, because the argument that they've made that that issue raised the factual issue, I disagree with it, because they had the burden. But the key issue is that that wasn't essential to the decision of the Court, and it isn't what California law provides, because the – that inquiry piece only comes up when you don't have suspicion. Once you have the suspicion, which they had here, which was imputed to everyone else, they had the notice. This goes with the policies of the statutes of limitation, which are twofold, to prevent stale claims and to prevent plaintiffs from sitting on their rights. They had information in 2005 and 2006. They waited until 2012. In this case, the information they had was enough, and that's why I would ask the Court to affirm the decision of the statute. Can I ask just one real quick follow-up question, if I could? I don't think you have ever answered the question that was asked at the very outset. When should they have had inquiry notice of the fact that the Aetna policy was not assignable? That's a specific allegation that they did not allege that. And so that aspect, they had inquiry notice of that plus everything else not later than 2008, because that is the reason. They knew there was – they had reason to believe in 2008 that the policy itself was not even assignable? No. They had reason to believe in 2008 that fraud had been committed on them and that that fraud encompassed a lot of different factors. That's one piece of omitted information that they claim. You don't have to – you don't have to have knowledge of 14 different omissions. If you say they committed fraud by omission in five ways and you plead that, and you later learn in discovery that you think there was a sixth or a seventh, the fact that you didn't know of the sixth or seventh claims when you pleaded your case would suggest you could split a cause of action. This comes to the gravamen of the claim and what a cause of action is. So in this case, that claim, like all the others, accrued no later than 2008. Thank you. Thank you. We'll give you a minute. We'll give you a minute for rebuttal. I think the Court has identified two issues that I think are important. First, whether it was reasonable for the Traybridge to retain a professional on their behalf to do the investigation who they believed knew more than – who they reasonably believed knew more than they did because he represented himself to be knowledgeable about fiat accords and insurance policies is a jury question under California law. But I think the other side is saying that that's not really the issue. Even if we say that was a reasonable thing to do because we don't – I don't understand insurance policy. I don't understand insurance law. I'm going to get an attorney. I'm going to get a professional to advise me. Let's say that's at least at a minimum a jury question. But they're saying that doesn't make any difference. As long as they were subjectively on inquiry notice, that's not really the issue. Well, I think that's a complete misstatement of California law, and we briefed that extensively in our briefs, and I would ask the Court to go back to the briefs and read the cases, in particular the Hobbs case that we cited. Thank you.  The case of Gravener v. William Page is submitted. And we are – oh, the next case is Tambury v. – is that right? Centrist. Centrist mortgage, and that was submitted on the briefs. And we are adjourned for today, the morning, and the week.
judges: Ikuta, Hurwitz, Melloy